The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Stephenson. The appealing party has not shown good grounds to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award except with the modification of several Findings of Fact.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties in a pretrial agreement and at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. All parties are properly before the North Carolina Industrial Commission and are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. On 29 March 1999 an employment relationship existed between plaintiff-employee and defendant-employer.
3. On 29 March 1999, defendant was self-insured with Trigon Administrators as the third party administrator.
4. Plaintiff's average weekly wage is to be determined by an Industrial Commission Form 22.
5. The package of plaintiff's medicals, received at the Commission 25 September 2000, are admitted into evidence as Stipulated Exhibit #2.
6. Plaintiff's Responses to Defendant's Interrogatories are admitted into evidence as Stipulated Exhibit #3.
7. Plaintiff's Employment File from defendant is admitted into evidence as Stipulated Exhibit #4.
8. Two photographs labeled 5a and 5b are admitted into evidence as Stipulated Exhibit #5.
9. An Industrial Commission Form 22 is admitted into evidence as Stipulated Exhibit #6.
10. Job descriptions for Lead Person B, Machine Off Bearer, Shaper Operator A, Chucking Machine Operator and Corner Block Boring Operator are admitted into evidence as Stipulated Exhibit #7.
11. The issues to be determined by the Commission are whether plaintiff sustained a compensable hearing loss under the Workers' Compensation Act, and if so, to what, if any, benefits is he entitled.
12. The depositions of Mark A. Faruque, M.D., Frank W. Mauldin, M.D., and Daniel R. Schumaier, Ph.D. are a part of the evidentiary record in this case.
 ***********
Based on the evidence of record and the findings of fact found by the Deputy Commissioner, the Full Commission finds as follows:
 FINDINGS OF FACT
1. On 29 March 1999 plaintiff was a fifty-four year old male employed by defendant as a materials expediter in the stock room. Plaintiff began working for defendant on 29 December 1987 in the machine off-bearer position transporting stock to and from the machine room. In May 1988 plaintiff started working as a machine operator on the corner block-boring machine. Plaintiff worked in this capacity until May 1989 when he began operating the chucking machine. In January 1994 plaintiff changed to the shaper machine and worked in this capacity until 19 May 1999. At that time he transferred to the stock room as a materials expediter.
2. Plaintiff worked in the machine room from May 1988 until 19 May 1999. All employees in the machine room are required to wear hearing protection at all times. Defendant supplied hearing protection devices, and plaintiff was able to choose from several accepted types of earplugs or earmuffs.
3. Defendant had in place a disciplinary program for any employee who failed to wear hearing protection devices. This program was in effect during plaintiff's entire time of employment with defendant.
4. As part of defendant's Hearing Conservation Program, they kept a chart detailing the hearing protection devices available for employees. Plaintiff tried various types of hearing protection devices. These included foam earplugs which plaintiff found the most comfortable. Plaintiff normally did not have any difficulty with the fit of his earplugs, and these earplugs gave him good noise protection. Plaintiff consistently and properly wore his earplugs. A nurse at defendant assisted with fit, and plaintiff always exchanged his plugs for a new pair when his old ones began to get hard. Plaintiff even assisted in defendant's program by reminding coworkers to wear hearing protection devices.
5. Defendant also conducted regular noise level surveys as part of their Hearing Conservation Program. Sound surveys were conducted by various employees wearing a dosimeter throughout their shift. This device measures the noise generated by the machines in the machine room as well as any noise produced by the suction device located in that room. The average of the noise levels in the machine room during plaintiff's tenure with defendant was 94.23 decibels. The annual training checklist indicates an exposure of 92 dBA. The greater weight of the evidence is that plaintiff's exposure was somewhere between 92 and 95 decibels for a 7.5 hour workday.
6. Earplugs or hearing protection devices have a noise reduction rating (or NRR). The NRR is the amount of decibels that the earplug will reduce a noise, if the hearing protection device is worn properly. The hearing protectors that plaintiff wore most of the time had NRR's from 22 to 32. Plaintiff wore the muff type only approximately six months. The muff type offers the least protection with an NRR of 22. Plaintiff wore the foam earplugs the vast majority of the time. These foam plugs offered an NRR of 29. The greater weight of the evidence is for the vast majority of plaintiff's tenure at defendant, he had an effective noise exposure level of 63 to 66 decibels. The effective noise exposure level is equal to the decibel level minus the NRR. For approximately six months with the muff type protection device, plaintiff's noise exposure level would have ranged from 70 to 73.
7. As a part of defendant's Hearing Protection Program, they regularly conducted hearing tests on plaintiff. Plaintiff received a baseline-hearing test on 29 December 1987 when he began employment with defendant. Plaintiff also received new employee orientation on that date which included a review of all safety procedures and hearing protection.
8. On 29 March 1998 plaintiff received a second orientation on OSHA standards and personal protection devices. Plaintiff reported on his auditory exam and history sheet from 1989 to 1992 that he did not have any hearing problems or noisy hobbies. Plaintiff developed diabetes and high blood pressure in 1990.
9. During the 1990's, defendant conducted seven hearing tests on plaintiff (none were done in 1998 at defendant's plant). In 1990, 1991 and 1993 plaintiff was informed about standard threshold shifts in his hearing. During that same period, plaintiff's hearing protection was evaluated as well. The fit and condition of plaintiff's hearing protection devices was determined to be good each time it was evaluated.
10. Plaintiff's baseline hearing code was B5 for his left ear and C4 for his right ear. The normal hearing status code is A3 for a man of plaintiff's age. The letters A, B or C are for low frequencies and numbers, which range from 1-7, are for high frequencies. In 1990 and 1991 a standard shift was noted. In June 1994 his high frequency hearing loss had worsened in both ears and had progressed gradually into the lower frequencies important for speech understanding. In June 1994 plaintiff's left ear hearing status code was C5 and plaintiff's right ear hearing status code was C4.
11. In February 1995 plaintiff's hearing had worsened to a C6 hearing status in the left ear and remained C4 in the right ear. In January 1996 plaintiff's right ear had further worsened to a C5 while the left ear remained at C6. Plaintiff's hearing continued to deteriorate when checked in 1997 and 1999.
12. Plaintiff has a history of coronary artery disease, hypertension, tobacco abuse, hyperlipidemia, and alcohol abuse. Plaintiff was diagnosed with a stroke in 1990. Dr. Mark A. Faruque, a family physician in Hickory, began treating plaintiff in 1991. At that time plaintiff was initially diagnosed with hypertriglyceridemia, Type IIB. In May 1995 plaintiff was treated for a right earache and had a small perforation in his right eardrum. In August 1996 plaintiff suffered from ASHD, Eustachian tube dysfunction, hypertension and hypercholeterolema. In April 1998 plaintiff had some diabetic kidney disease. In June 1998 plaintiff had hypertension, diabetic neuropathy and allergic rhinitis. In April 1999 plaintiff had Eustachian tube dysfunction and nasal congestion. His right tympanic membrane (eardrum) had no movement and was dull with significant retraction. When plaintiff's right eardrum had not changed in May 1999, Dr. Faruque referred plaintiff to Dr. Frank W. Mauldin, an otolaryngologist.
13. Dr. Mauldin evaluated plaintiff on 3 May 1999, 8 June 1999 and 16 March 2000. Plaintiff was diagnosed as predominantly suffering from bilateral sensorineural hearing loss. This is a nerve-type deafness which cannot be recovered and can only be treated with hearing amplification. Medication or surgery will not improve or correct this problem.
14. Plaintiff did not originally reveal to Dr. Faruque or Dr. Mauldin that he hunted. Plaintiff hunted for approximately thirty (30) years except from 1987 to 1995 due to his heart condition.
15. Dr. Daniel Schumaier, an audiologist, did a complete review of plaintiff's records and examinations. As an audiologist, Dr. Schumaier evaluates and nonmedically treats patients for hearing loss. Additionally, he assists hundreds of companies with their hearing conservation programs and compliance with OSHA regulations. Dr. Schumaier's patients include referrals from physician who specifically request his opinion as to the type of hearing loss. To reach these diagnoses, Dr. Schumaier performs a variety of diagnostic tests, and he is often required to state diagnoses for Medicare, Medicaid and insurance purposes. Dr. Schumaier completely reviewed of plaintiff's employment records and hearing examinations and testified that plaintiff's resulting effective noise exposure at his place of employment was in a safe range.
16. Dr. Mauldin, an expert in otolaryngology, when asked about the source of plaintiff's hearing loss taking into account plaintiff's employment history in a mining operation with no hearing protection, plaintiff's hunting without earplugs, his recurrent middle ear infections, and plaintiff's entire medical history including diagnoses of arterial sclerotic heart disease, chronic vascular headaches, arthrosclerotic peripheral vascular disease, diabetes, hypertension, smoking, and the natural aging process, could not say that plaintiff's employment with defendant was more likely the cause of plaintiff's sensorineural hearing loss.
17. While plaintiff has bilateral sensorineural hearing impairment, the greater weight of the competent evidence shows that plaintiff's pre-existing hearing loss prior to his employment with defendant was not augmented or increased by his noise exposure while employed with defendant.
18. The greater weight of the medical evidence is that plaintiff's hunting without earplugs, his recurrent middle ear infections, and especially plaintiff's diabetes, hypertension, smoking, and the natural aging process are more likely the cause of plaintiff's sensorineural hearing loss, rather than plaintiff's employment with defendant.
 ***********
Based upon the findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. The greater weight of the evidence is that plaintiff's bilateral sensorineural hearing loss is not an occupational disease within the meaning of N.C. GEN. STAT. § 97-53(28).
2. The plaintiff, therefore, is entitled to no compensation under the North Carolina Workers' Compensation Act.
 ***********
Based on the foregoing findings of fact and conclusions of law, the Full Commission affirms the holding of the Deputy Commissioner and enters the following:
 ORDER
1. Under the law, plaintiff's claim must be, and is hereby, DENIED.
2. Each side shall bear their own costs.
This the ___ day of October 2001.
 S/____________ BUCK LATTIMORE CHAIRMAN
CONCURRING:
 S/______________ RENE C. RIGGSBEE COMMISSIONER
 S/_______________ DIANNE C. SELLERS COMMISSIONER